2008 UT App 30

**SALT LAKE CITY, Plaintiff and Appellant,**

v.

**Tim Kelly BENCH, Defendant and Appellee.**

No. 20060929.

Court of Appeals of Utah.

Jan. 25, 2008.

Aaron W. Flater and Bernadette M. Gomez, Salt Lake City, for Appellant.

Jason A. Schatz, Salt Lake City, for Appellee.

Before DAVIS, ORME, JJ., and THORNE, Associate P.J.

## OPINION

ORME, Judge:

¶ 1 Salt Lake City appeals the trial court's order granting Defendant Tim Kelly Bench's motion to suppress evidence obtained following a traffic stop, which led to his arrest for

driving while intoxicated. The City argues that there was reasonable, articulable suspicion to justify the stop based on Bench's ex-wife's telephoned report and on a police officer's observation of Bench's cautious driving. Additionally, the City essentially argues that the legal standards for establishing reasonable suspicion are lessened in a drunk driving case because of public safety concerns. We affirm the trial court's decision.

## BACKGROUND [1]

¶ 2 On April 12, 2005, Officer Hudson heard via a dispatch report over his police radio that Bench's ex-wife had called 911 and reported that Bench, who had just dropped off their children at her home in Salt Lake City's Rose Park area, had transported the children in his vehicle while intoxicated. The dispatcher relayed the above information, described Bench's vehicle, identified its license plate number, and gave Bench's home address.

¶ 3 While patrolling in the Glendale area approximately thirty blocks away, Officer Hudson saw a vehicle that matched the dispatcher's description. He made a U-turn and began following the vehicle, which he identified as Bench's because the license plate number matched the one reported. While following Bench, Officer Hudson observed that Bench slowed his vehicle to approximately 25 miles per hour, about 10 miles per hour below the posted speed limit, and signaled for some five seconds before changing lanes. Officer Hudson observed no driving or equipment infractions before initiating a traffic stop two blocks later.

¶ 4 After further investigation, Officer Hudson arrested Bench for driving while intoxicated, a violation of Utah Code section 41–6a–502. *See* Utah Code Ann. § 41–6a–502 (2005). Bench moved to suppress all evidence obtained as a result of the stop,

arguing that Officer Hudson did not have the requisite reasonable, articulable suspicion to justify stopping him. The trial court agreed, granted the motion,[2] and later dismissed the case for lack of evidence. The City appealed. *See id.* § 77–18a–1(3)(b) (Supp.2007) (allowing prosecution to appeal in such circumstances).

## ISSUE AND STANDARD OF REVIEW

■■■ ¶ 5 The sole issue presented for our review is whether Officer Hudson, given only the information radioed by the 911 dispatcher and his own observations of Bench's cautious driving, had reasonable, articulable suspicion of criminal wrongdoing sufficient to justify stopping Bench. In an appeal from a trial court's denial of a motion to suppress evidence, "we review the trial court's factual findings for clear error[,] and we review its conclusions of law for correctness." *State v. Tiedemann*, 2007 UT 49, ¶ 11, 162 P.3d 1106. "In search and seizure cases, no deference is granted to ... the [trial] court regarding the application of law to underlying factual findings." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699 ("We abandon the standard which extended 'some deference' to the application of law to the underlying factual findings in search and seizure cases in favor of non-deferential review.").

## ANALYSIS

¶ 6 On appeal, the City argues that there was reasonable suspicion to justify the stop based on the dispatch report describing Bench's ex-wife's complaint and on Officer Hudson's observation of Bench's cautious driving. The City also argues that the legal standards for establishing reasonable suspicion are lessened in drunk driving cases as a matter of public policy, and that in cases like

---

1. Our recitation of the facts is based on the trial court's findings of fact, supplemented with evidence in the record which supports the findings.

2. In ruling from the bench, the trial court commented:

> [I]n my mind there's clearly not enough evidence to stop—to pull Mr. Bench over based on his driving pattern.

> I mean, if it's not illegal, ... if you allow this, then where do you stop pulling anybody over for anything? You're driving too legally, you know....

> So then there's the question of does the dispatch call make a difference? Does that broaden the umbrella? I think it does somewhat, but certainly not enough in this case.

this one, a concern for public safety mandates a stop when officers receive a report of a potentially intoxicated driver. We address each argument in turn.

## I. Reasonable Suspicion

■ ¶7 Both the United States and Utah constitutions protect against "unreasonable searches and seizures." U.S. Const. amend. IV; Utah Const. art. 1, § 14. A traffic stop constitutes a "seizure" and must, therefore, be reasonable if it is to withstand a constitutional challenge. *See State v. Case*, 884 P.2d 1274, 1276 (Utah Ct.App.1994). A traffic stop is reasonable only if it is initially justified and does not exceed the scope of the circumstances that justified it. *See id.* (citing *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). It is initially justified if a police officer has a reasonable suspicion, prior to the stop, that a person is engaging in, or has engaged in, criminal behavior. *See id.;* Utah Code Ann. § 77–7–15 (2003) (codifying reasonable suspicion requirements). " '[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *State v. Menke*, 787 P.2d 537, 541 (Utah Ct.App.1990) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). "While the required level of suspicion is lower than the standard required for probable cause to arrest, the same totality of facts and circumstances approach is used to determine if there are sufficient 'specific and articulable facts' to support reasonable suspicion." *Case*, 884 P.2d at 1276 (quoting *Terry*, 392 U.S. at 21 88 S.Ct. 1868). Furthermore, an officer's suspicion must be based on objective facts suggesting some sort of criminal conduct, *see Menke*, 787 P.2d at 541, and "is dependent upon both the content of information possessed by police and its degree of reliability," *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

■ ¶8 "The articulable facts supporting reasonable suspicion are usually grounded in an officer's personal perceptions and inferences, but in some cases the officer may rely upon external information—e.g., an informant's tip via police dispatch" in conclud-

ing there is a legal basis for a stop. *Kaysville City v. Mulcahy*, 943 P.2d 231, 234 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997). *Accord State v. Pena*, 869 P.2d 932, 940 (Utah 1994) ("[U]nder certain circumstances, police officers can rely on a dispatched report in making an investigatory stop."); *Case*, 884 P.2d at 1277 n. 5 (stating that an officer receiving a dispatched message "may take it at face value and act on it forthwith"); *State v. Grovier*, 808 P.2d 133, 135 (Utah Ct.App.1991) ("A reasonable suspicion may be premised upon an informant's tip so long as it is sufficiently reliable."). If an officer does rely on such external information to justify stopping a suspect, but "cannot provide independent or corroborating information through his or her own observations," the legality of that stop will ultimately depend on "the sufficiency of the articulable facts known to the individual *originating* the information or bulletin subsequently received and acted upon by the investigating officer." *Case*, 884 P.2d at 1277 (emphasis in original). "[S]hould the investigation end in arrest and the stop's legality be attacked, the [prosecution] must—'albeit after the fact'—establish that adequate articulable suspicion initially spurred the dispatch." *Mulcahy*, 943 P.2d at 234 (quoting *Case*, 884 P.2d at 1277 n. 5).

¶9 This case does not present the more familiar situation where a dispatcher simply broadcasts a "stop and investigate" directive, making it necessary for the prosecution to later reconstruct what the dispatcher actually knew in making her determination that there was reasonable suspicion on which to base a stop. Rather, the information broadcast by the dispatcher in this case was everything she knew—or so we infer from the City's decision not to call the dispatcher as a witness or introduce a tape recording of the 911 call, but instead to rely exclusively on Officer Hudson's testimony about the dispatch.

¶10 Accordingly, we must determine whether the information conveyed by Bench's ex-wife, as recounted by the dispatcher, together with the inferences that can be drawn therefrom, establish a reasonable suspicion that Bench was driving while intoxicated so as to justify Officer Hudson in stopping Bench—either on that basis alone

or when coupled with his observations of Bench's cautious driving. We note that while the City argues on appeal that the information from the ex-wife was enough, Officer Hudson's conduct suggests he did not think so. Rather than immediately effecting a stop upon seeing Bench's vehicle, he instead followed behind, looking for signs of impairment. After following Bench for two blocks, he finally concluded that he saw such signs of impairment, namely slow driving and long signaling. We first consider whether Officer Hudson's observations provided corroboration of the unadorned claim of intoxication relayed by the dispatcher.

### A. Cautious Driving

¶ 11 The City contends that "Officer Hudson personally observed a driving pattern that was consistent with impaired driving and that he considered to be suspicious." Like the trial court, we disagree that cautious driving is indicative of intoxication or other wrongdoing.

¶ 12 In following Bench, Officer Hudson did not observe any illegal activity. On the contrary, he observed only Bench's hyper-legal activity—driving well below the posted speed limit and signaling two seconds longer than legally required before changing lanes. *See* Utah Code Ann. § 41–6a–804(1)(b) (2005) (drivers must signal *at least* three seconds before changing lanes).[3] From this, he says he became suspicious, testifying that "when I see somebody driving that carefully, and I'm already paying attention to them ... then that definitely indicates to me that something's going on. That they know I'm there and that they don't want me to stop them." Safe, ultra-cautious driving, however, even if motivated by a desire to avoid police contact, does not, without more, create reasonable suspicion sufficient to justify a traffic stop. Simply put, a desire to avoid an encounter with police does not indicate that a person is driving while intoxicated or is otherwise engaged in criminal activity. In another reasonable suspicion case, *State v.*

*Talbot,* 792 P.2d 489 (Utah Ct.App.1990), we commented that

> citizens will avoid contact with police for reasons other than fear of being caught for a crime they have committed. A completely innocent person may wish to avoid the delay which a discussion with police may entail; others have a fear of police authority; still others resent and seek to avoid the "hassle" of a stop which lacks any basis.

*Id.* at 494 n. 11. *Cf. Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting) ("[T]he right to be let alone [is] the most comprehensive of rights and the right most valued by civilized men."), *cited with approval in Winston v. Lee,* 470 U.S. 753, 758–59, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

¶ 13 Bench's conduct, far from being suggestive of intoxication, was "consistent with the habits and conduct of a normal driver.... [W]ithout more, [it did] not provide a reasonable basis to suspect [him] of being intoxicated." *Sandy City v. Thorsness,* 778 P.2d 1011, 1012–13 (Utah Ct.App.1989). Prudent driving—going slower than the posted speed limit in a residential area and signaling for a couple of seconds longer than the statutory minimum—is simply not suspicious. It is commendable. And but for the radioed report Officer Hudson received that no doubt colored his assessment of the lawful driving pattern he observed, we cannot imagine that his observation would prompt him to stop Bench and investigate possible criminal behavior.

### B. Bench's Ex-wife's Report

¶ 14 We next consider whether Bench's ex-wife's report, as broadcast by the dispatcher, provided a sufficient basis on which to justify the stop. To establish that adequate articulable suspicion spurred the dispatcher's broadcast, the prosecution must show that Bench's ex-wife's tip was reliable. *See Kaysville City v. Mulcahy,* 943 P.2d 231, 234 (Utah Ct.App.), *cert. denied,* 953 P.2d 449 (Utah 1997). We consider three factors to

---

**3.** This section was amended in 2007 to substitute "two seconds" for "three seconds." *See* Utah Code Ann. § 41–6a–804(1)(b) & amendment notes (Supp.2007). The earlier version of the statute is applicable here.

determine the reliability of an informant's tip: (1) "the type of tip or informant involved"; (2) "whether the informant gave enough detail about the observed criminal activity to support a stop"; and (3) corroboration of the information by law enforcement through a "police officer's personal observations." *Id.* at 235–36. We address each of these factors in turn.

### 1. Type of Tip or Informant Involved

■ ¶ 15 The City argues that Bench's ex-wife, as an identified citizen-informant, is a reliable source of information. Because a citizen-informant "volunteer[s] information out of concern for the community and not for personal benefit," *id.* at 235 (citation and internal quotation marks omitted), and because "the informant is exposed to possible criminal and civil prosecution if the report is false," *id.* (citation and internal quotation marks omitted), a tip from an identified citizen-informant is generally considered "highly reliable." *City of St. George v. Carter*, 945 P.2d 165, 169 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1998). *See Mulcahy*, 943 P.2d at 235 ("An identified 'citizen-informant' is high on the reliability scale[.]") (citation omitted). However, there are circumstances where a citizen-informant's veracity may properly be called into question. *See, e.g.*, *State v. Anderson*, 910 P.2d 1229, 1233 (Utah 1996) ("[P]olice expressed some question of [an informant]'s veracity due to a bias she may have harbored toward her ex-paramour."); *State v. White*, 856 P.2d 656, 662 (Utah Ct.App.1993) (recognizing that ex-wife's allegations that defendant was high on cocaine and had been involved in a domestic disturbance earlier in the day were of "questionable reliability"); *United States v. Phillips*, 727 F.2d 392, 393–94, 398 (5th Cir.1984) (noting that evidence informant was defendant's estranged wife, who had recently quarreled with and left her husband, "may have cast doubt on her trustworthiness"); *United States v. Hodges*, 705 F.2d 106, 108 (4th Cir.1983) (discussing veracity of defendant's former live-in girlfriend who perhaps "harbored ill will toward" him); *Louisiana v. Morris*, 444 So.2d 1200, 1204 (La.1984) (discussing veracity of informant who, involved in a custody dispute with his wife, may have

wanted to give "a false report to embarrass or inconvenience" her); *Minnesota v. Lindquist*, 295 Minn. 398, 205 N.W.2d 333, 335 (1973) ("[A] prior relationship with a suspect might give an informer motive to lie or exaggerate."); *Montana v. Olson*, 314 Mont. 402, 66 P.3d 297, 303 (2003) (observing that evidence of a "strained relationship" between informant and his defendant wife, who had separated from him, may indicate that the informant had mixed motives). Such a concern is surely presented here, given that the citizen-informant was Bench's ex-wife and that malice or ill will is a typical—albeit not inevitable—product of divorce.

¶ 16 We in no way suggest that Bench's ex-wife actually harbored any ill will toward Bench, or that her report was motivated by anything other than a concern for public safety. What we do suggest is that in circumstances where, as here, a citizen-informant's veracity is questionable, the fact that the citizen-informant identified herself carries significantly less weight in establishing the reliability of her tip and justifying a stop than it otherwise would. *See* 2 Wayne R. LaFave, *Search and Seizure* § 3.4(a), at 229 (4th ed.2004). This does not end our inquiry. It just makes the other factors—the detail of the information provided and corroboration—all the more important. *Cf. Anderson*, 910 P.2d at 1233 (stating that concerns about an ex-girlfriend's bias "were resolved when the police received the same information the next day from an independent source" and were able to "verif[y] almost every detail of the informant's accounts" before making a stop).

### 2. Details About the Observed Criminal Conduct

■ ¶ 17 An informant's report of illegal activity must be sufficiently detailed to justify a stop. *See Kaysville City v. Mulcahy*, 943 P.2d 231, 236 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997). In *Mulcahy*, we held that sufficient detail was provided when an informant reported personally observing a " 'drunk individual' " leaving his residence "in a white car—possibly a Toyota—heading out of his subdivision, toward the main road." *Id.* at 237. The City argues that Bench's ex-wife provided at least as

much detail here as was provided to law enforcement there.

¶ 18 While Bench's ex-wife may have provided the same basic facts as the informant did in *Mulcahy*, the totality of circumstances surrounding the two cases is very different, and *Mulcahy* is easily distinguishable. In *Mulcahy*, we determined that the details provided had "a heightened air of reliability because [the informant] personally observed those details.... The events prompting [the] call unfolded as he spoke on the phone with the dispatcher. He reported [the defendant]'s activities as he was seeing them." *Id.* Similarly, in *State v. Roth*, 827 P.2d 255 (Utah Ct.App.1992), we found that an informant provided a sufficient "factual foundation" in reporting "the existence of a drunk driver along with a description of the driver's vehicle, license number, and location." *Id.* at 258. But there, police responded quickly, spotted the suspect vehicle while arriving at the very location the informant had reported, and observed that the defendant " 'was having a hard time driving' and that he was driving 'slow and jerky.' " *Id.* at 256.

¶ 19 We think it significant that in both *Mulcahy* and *Roth*, the details about the observed criminal conduct, though sparse, were *strongly* supported by at least one of the other factors—either the reliability of the informant or corroboration by law enforcement. In the absence of that strong support, an informant, like Bench's ex-wife, must provide more detail to establish the reliability and sufficiency of her report. *Cf. State v. Valenzuela*, 2001 UT App 332, ¶ 19, 37 P.3d 260 (noting that an informant's report is more reliable when it provides " 'a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties not easily predicted.' ") (quoting *Illinois v. Gates*, 462 U.S. 213, 245, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (emphasis omitted).

Bench's ex-wife apparently provided little to the dispatcher beyond her unexplained assessment that Bench was intoxicated.[4]

¶ 20 The lack of detail supporting Bench's ex-wife's report of his intoxicated driving is not necessarily a fatal flaw, however, for "members of the general public have a common knowledge about whether a person is under the influence of alcohol." *Mulcahy*, 943 P.2d at 237 (citation omitted). Still, such detail—which apparently Bench's ex-wife was in a position to provide, *see supra* note 4— would have gone a long way in satisfying the concerns implicated by her questionable reliability as his ex-wife.

3.  Corroboration by Law Enforcement

¶ 21 An officer may corroborate an informant's tip " 'either by observing the illegal activity or by finding the person, the vehicle and the location substantially as described by the informant.' " *Mulcahy*, 943 P.2d at 236 (quoting *Oregon v. Bybee*, 131 Or.App. 492, 884 P.2d 906, 908 (1994)). " '[W]here the reliability of the information is increased, less corroboration is necessary.' " *Id.* (quoting *Texas v. Sailo*, 910 S.W.2d 184, 188 (Tex.Ct.App.1995)). Conversely, where the reliability of the information is in question, more corroboration is required.

¶ 22 We have already concluded that Bench's cautious driving was not indicative of intoxication. Beyond that, though, the City argues that Officer Hudson sufficiently corroborated the information given to him when he observed Bench's vehicle and confirmed that the license plate number matched the number reported.

¶ 23 This argument is similar to that made by the State in *State v. Case*, 884 P.2d 1274 (Utah Ct.App.1994). There, as here, the prosecution argued that a police officer "corroborated dispatch's information by stopping an individual in the area [5] who appeared to

---

**4.** Apparently in a later interview, Bench's ex-wife told police that Bench "smelled strongly of alcohol, that he had poor balance, that he slurred his speech and that his eyes were glassy." From all that appears in our record, these compelling details were neither volunteered to nor elicited by the dispatcher. Indeed, the City did not argue at the suppression hearing that Bench's ex-wife

gave the dispatcher these important details. And for purposes of our analysis, of course, it is the information the dispatcher knew that matters. *See Kaysville City v. Mulcahy*, 943 P.2d 231, 234 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997).

**5.** In this case, the "area" referred to is apparently the west side of Salt Lake Valley, given that

match the physical description given." *Id.* at 1279. "This," we said, "is not corroboration of criminal activity, only of physical characteristics that by themselves have no relevance to criminal activity." *Id.* As we explained, "seeing a person who matches the description of [a suspect cannot] become corroboration for the suspected offense that is so lacking in reasonable and articulable suspicion. Such boot strapping simply does not work, for the reason that *whom* the police are looking for has nothing to do with *why* the suspect is sought." *Id.* at 1279 n. 11 (emphasis in original).

¶ 24 Under the circumstances here, where a potentially biased informant provided very little information to police, the fact that Officer Hudson saw Bench driving in a prudent manner thirty blocks from his ex-wife's home was insufficient corroboration to establish the reliability of the tip or to otherwise justify Officer Hudson in stopping him.

## II. Public Safety

¶ 25 The City asserts that "due to the extreme danger posed by impaired drivers, public safety concerns justify Officer Hudson's stop of the car because the assurance of public safety by removing impaired drivers from the road substantially outweighs the minimal intrusion into Mr. Bench's right to be free from unreasonable searches and seizures." Thus, the City essentially argues that the legal standards for establishing reasonable suspicion are lessened in a drunk driving case as a matter of public policy, and that in cases like this one, a concern for public safety mandates a stop when officers receive any report of a potentially intoxicated driver. In making its argument, the City relies on our comments in *Kaysville City v. Mulcahy*, 943 P.2d 231 (Utah Ct.App.), *cert. denied*, 953 P.2d 449 (Utah 1997), where we said that " '[a]n investigatory ... stop of a suspected drunken driver is a [comparatively] minimal intrusion upon that driver's freedom of movement and privacy' " and agreed with the rationale in a Kansas opinion " 'that the greater and more immediate the risk to the public revealed by the tip, the less importance we will accord to the process of corrob-

Officer Hudson spotted Bench some four miles

oration or verification of the tip.' " *Id.* at 236 (quoting *State v. Tucker*, 19 Kan.App.2d 920, 878 P.2d 855, 861–62 (1994)) (alteration in original).

¶ 26 Certainly, where an informant reports a drunk driver on the road, we must consider

> "the ever-changing equation used to balance the rights of an individual to be free from unwarranted intrusions of his or her freedom of movement and right to privacy with the right of the public to be protected from unreasonable danger. This equation and the balance change with the facts presented."

*Id.* at 236 (quoting *Tucker*, 878 P.2d at 858). Without in any way diminishing the importance of the observations made in *Mulcahy*, we simply observe that on these facts, the balance weighs heavily on the side of Bench's constitutional rights.

## CONCLUSION

¶ 27 We agree with the trial court that Officer Hudson lacked sufficient reasonable, articulable suspicion to justify stopping Bench for driving while intoxicated. The circumstances surrounding Bench's ex-wife's report called her credibility into question, requiring more detail and greater corroboration to establish the reliability of her report. As she only provided a conclusory statement that Bench was intoxicated, without telling the dispatcher any facts that would support such a conclusion, we conclude that her report was not very reliable. Furthermore, Officer Hudson observed nothing, prior to the stop, that corroborated the report of intoxication. Bench's cautious driving was not a reasonable basis on which to suspect that he was driving while intoxicated. Thus, Officer Hudson lacked reasonable, articulable suspicion of criminal wrongdoing sufficient to justify stopping Bench.

¶ 28 The trial court's suppression and dismissal orders are affirmed.

¶ 29 I CONCUR: JAMES Z. DAVIS, Judge.

from his ex-wife's residence.

¶ 30 I CONCUR IN THE RESULT: WILLIAM A. THORNE JR., Associate Presiding Judge.